# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No.  52872-0-II |
| FORREST EUGENE AMOS, | |
| Petitioner. | UNPUBLISHED OPINION |

LEE, C.J. — Forrest E. Amos appeals the trial court's order on remand from this court denying his personal restraint petition (PRP), arguing that the trial court erred by concluding that he did not receive ineffective assistance of counsel prior to entering his guilty plea.  Amos also raises additional arguments related to his ineffective assistance of counsel claim in his statement of additional grounds (SAG).[1]  Because Amos did not meet his burden to show that he received ineffective assistance of counsel prior to entering his guilty plea, the trial court properly denied his PRP.  Accordingly, we affirm.

## FACTS

On July 31, 2014, Amos pled guilty to several criminal charges.[2]  *In re Pers. Restraint of Amos*, 1 Wn. App. 2d 578, 585, 406 P.3d 707 (2017).  Amos' guilty plea included a waiver of any appeal or collateral attack.  *Id*.  However, on January 5, 2016, Amos filed a PRP with this court. *Id.* at 588.

---

[1]  RAP 10.10.  We note that in a PRP, a petitioner may not file a SAG.  However, because Amos is appealing the trial court's order determining his PRPs on the merits, we consider his SAG claims.

[2]  The nature of the charges is not at issue in this case.

No. 52872-0-II

This court held that, while Amos waived his right to collateral attack, the validity of the waiver was called into question by his allegations of ineffective assistance of counsel. *Id.* at 593. Specifically, Amos was arguing that he received ineffective assistance because of his counsel's failure to file a CrR 8.3 motion to dismiss the charges based on an alleged violation of the attorney-client relationship.[3] *Id.* at 594.

This court held,

> If the actions of the State violated Amos' attorney-client relationship, then the charges should have been dismissed, unless the State proved beyond a reasonable doubt that the violation did not result in any prejudice to the defendant.

*Id.* at 597-98. However, this court could not determine whether Amos received ineffective assistance of counsel based on the record before it. *Id.* at 600. Instead, this court remanded to the trial court for an evidentiary hearing to resolve six factual questions and to determine the merits of Amos' PRP:

> The trial court will conduct a factual hearing to determine (1) the nature of the cell search, (2) whether officers or other state officials seized or reviewed the documents, (3) what were the nature and contents of those documents, (4) if a violation of the attorney-client relationship did occur, whether the State can show beyond a reasonable doubt that Amos was not prejudiced, (5) whether Amos would not have pled guilty but for his attorney's deficient actions or advice, and (6) any other factual questions the trial court deems necessary to make a determination.

*Id.* at 600-01.

---

[3] Amos also made other allegations of ineffective assistance of counsel that are not relevant to the issue currently before this court. *Amos*, 1 Wn. App. 2d at 594.

A.      EVIDENTIARY HEARING

The trial court held an evidentiary hearing on Amos' PRP on September 5, 2018.  Several

witnesses testified at the hearing, including the officer who performed the cell search, multiple

prosecuting attorneys, the superior court judge who conducted an *in camera* review of the seized

documents, Amos' trial attorney, and Amos himself.[4]

1.      Detective Haggerty's Testimony

Detective Adam Haggerty of the Centralia Police Department testified that he served a

search warrant on Amos' jail cell on June 18, 2014.  Amos was unhappy that Detective Haggerty

was serving the search warrant and expressed concern about his pending lawsuit against the

Department of Corrections (DOC), which was irrelevant to Detective Haggerty's investigation.

Detective Haggerty did not read the contents of the documents during the search, but he looked

for anything that had a heading or header for "the prosecutor's office, DOC, his attorney," or "DOC

legal stamp," pushed them to the side, and left them behind.  I Verbatim Report of Proceedings

(VRP) (Sept. 5, 2018) at 121.  He estimated that the entire search took about 10 minutes.  Detective

Haggerty secured the seized documents in his police vehicle and returned to his office.

On the way to his office, Detective Haggerty called Amos' defense attorney, Don Blair,

and advised him of the search.  After speaking with Blair, Detective Haggerty decided to secure

---

[4]  Amos testified at the evidentiary hearing.  However, the trial court explicitly found that "Amos'
testimony was not credible."  Clerk's Papers (CP) at 240.  The trial court included several examples
of Amos' "complete disregard for the truth."  CP at 241.  "'Credibility determinations are for the
trier of fact' and are not subject to review."  *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401
P.3d 19 (2017) (quoting *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).  Because we
do not review a trial court's credibility determinations, Amos' testimony has no evidentiary value
and will not be discussed further.

the seized documents pending an *in camera* review by a judge. Detective Haggerty did not review any of the documents prior to the *in camera* review.

After the *in camera* review by Judge Nelson Hunt of the Lewis County Superior Court, the seized documents were split into three groups: (1) documents that were relevant to Detective Haggerty's investigation, (2) documents that were irrelevant to the investigation, and (3) documents that were not released to Detective Haggerty.[5] Judge Hunt kept the documents that were not released to Detective Haggerty. Detective Haggerty sorted the released documents into relevant and irrelevant documents. The relevant documents were maintained as evidence. The irrelevant documents were secured pending release to Blair.

Detective Haggerty reviewed the seized documents. Detective Haggerty did not recall seeing any letters from either of Amos' defense attorneys or reviewing any documents pertaining to legal strategies.

---

[5] The reference to the documents in this case is a bit convoluted because they went through several transitions and designations. Detective Haggerty originally designated *all* of the items seized from Amos' cell as evidence item number 5. After the *in camera* review, the evidentiary documents stayed item number 5, but the irrelevant documents were designated as evidence item number 8. At the evidentiary hearing, item 5 was admitted as Exhibit 34. Item 8 was admitted as Exhibit 35. The documents in Exhibit 34 and 35 were uploaded into the discovery system as discovery package 11. The index for discovery package 11 was admitted at the evidentiary hearing as Exhibit 41. For ease of reference, we will simply refer to the "seized documents," rather than specific Exhibit or item numbers.

We also note that Exhibit 43 refers to additional documents that were uploaded to the prosecutor's office after Amos pled guilty. Although the trial court appears to have treated these documents as also resulting from the cell search, the date of the documents contained in them demonstrate that they were generated after the cell search occurred. Accordingly, we do not consider Exhibit 43 as relevant to the determination of this case.

### 2.    Judge Hunt's Testimony

Judge Hunt performed the *in camera* review of the documents seized from Amos' jail cell.

Judge Hunt testified that he identified some documents "[c]ould be privileged":

> There were several hundred pages, and I went through the documents with the bias, if you will, to find privileged material so that this kind of a hearing would not happen at some later date.
> So the answer to your question of did I find anything, the answer is I think there were about six pages that may have had something to do with privilege, but it was not real clear one way or the other, and with the way that I was approaching the case, I set them aside. But, you know, I really don't remember anything like, "I talked to my attorney, and this is what he said." There was nothing like that.

I VRP (Sept. 5, 2018) at 182. Judge Hunt exercised caution to protect Amos' right to counsel.

Judge Hunt determined that something was privileged "if it referenced any contact with his lawyer, regardless of whether it contained any communications." I VRP (Sept. 5, 2018) at 187. Judge Hunt testified "it was very clear what were personal notes." I VRP (Sept. 5, 2018) at 189.

After his review, Judge Hunt kept the six documents that could be privileged to return to Blair. The remaining documents were returned to Detective Haggerty. Judge Hunt did not notify Blair that he was conducting the *in camera* review. And Judge Hunt would not have permitted Blair to be present during the *in camera* review.

### 3.    Prosecuting Attorneys' Testimony

William Halstead was the deputy prosecuting attorney assigned to Amos' 2013 case. Halstead and Blair negotiated a plea agreement to resolve that case. At the evidentiary hearing, Halstead testified he had no involvement with Detective Haggerty regarding the search of Amos' cell prior to the actual search. After the search, Halstead confirmed that Detective Haggerty should request an *in camera* review of the documents.

5

The prosecuting attorney's office received the seized documents in their discovery system on July 23.  The seized documents were provided to Blair as a discovery package on July 24.  Although the prosecuting attorney's office received the documents and provided the discovery package to Blair, Halstead testified that he did not remember ever going through any of the documents and that they had no impact on his plea negotiations with Blair.

Halstead also testified that on July 30, 2014, the trial court signed an order releasing the seized documents.  The next day, Amos entered his guilty plea.  Halstead explained that he and Blair had been working on the plea agreement for "quite some time."  I VRP (Sept. 5, 2018) at 218.  Neither the seized documents nor the order had any impact on the plea deal, and Halstead did not know what was in the documents that were seized.

Eric Eisenberg was a deputy prosecuting attorney with Lewis County Prosecuting Attorney's office at the time of the cell search.  Eisenberg spoke with Detective Haggerty briefly after the search was conducted.  Detective Haggerty wanted to confirm that an *in camera* review was appropriate before reviewing the seized documents.  Eisenberg told Detective Haggerty not to look at any documents until he obtained an *in camera* review.

4.      Blair's Testimony

Blair represented Amos in the 2013 case.  Blair filed numerous motions in the case.  There was also a significant amount of ongoing discovery in the case, including several supplemental discovery requests.  Blair met with Amos many times to prepare for the case.  He also received notes on the case from Amos.  Blair explained,

> [M]y practice, especially in a case like this, was to make a copy of the discovery, because he couldn't come to my office to review it, and I know I couldn't give him a copy, but until, I think, yesterday I believed the procedure was—and I believed it

6

> from communicating with the jail—I would deliver a copy of the discovery to the jail, and they would bring the client/inmate up to booking in the evening, and they would allow them as much time as they wanted in the evening, for as many evenings as they needed, to go through the discovery. And my instruction is always go ahead and make notes on the discovery that I leave.

II VRP (Sept 6, 2018) at 268-69. Blair received about six pages of notes from Amos on the discovery. Blair testified that Amos was also a "prolific researcher" and would often give case citations for Blair to review. II VRP (Sept. 6, 2018) at 270. Blair also explained that he did not believe Detective Haggerty could have actually taken any documents related to discovery:

> I don't know what they took. And here's the thing. Whatever they took wasn't necessarily—it wasn't anything that I had sent [Amos], because I never have sent anything to the jail mail-wise, so the only thing that I had given to [Amos]—again, up until, I think yesterday—was the discovery.
> And my understanding until yesterday was that discovery was always kept up at booking where he would have been, you know, keeping these notes on the discovery. So in my mind at that time I didn't think that they would get any secrets, and what potentially they could get, in my mind, is maybe stuff that [Amos] had been doing that maybe he shouldn't have been doing.

II VRP (Sept. 6, 2018) at 297.

Blair also testified that he spoke to Detective Haggerty after Detective Haggerty searched Amos' jail cell. Blair advised Detective Haggerty to seek *in camera* review before reviewing any of the documents. Blair testified that he had "full trust in Judge Hunt making a determination that something was or was not privileged." II VRP (Sept. 6, 2018) at 305.

Blair testified that Amos complained many times about the fact that his materials had been taken and none of his materials had been returned to him. Amos wanted Blair to file a CrR 8.3 motion to dismiss the case. Blair began preparing a CrR 8.3 motion on July 11. Blair saw two grounds for the motion: the cell search and the ongoing discovery disputes with the prosecuting attorney's office. Blair explained,

> Well, the cell search may have been an issue, but, again, I don't know if it would have, because I don't know what was in there. So I can't tell you if that would have been the issue.
>
> I know [Amos] didn't like the fact that they came in and took his stuff from what he thought of as his home, and I understand that. [Amos] liked to talk a lot. Too much sometimes. I'm not relying on [Amos] for my motion. The issues that I was raising with my motions remained in my mind unresolved, because I didn't have this discovery. That was the biggest thing for me.

II VRP (Sept. 6, 2018) at 276. Blair felt that the discovery issue was a stronger basis for filing the motion to dismiss and did not want to file the motion to dismiss too soon to give the State the opportunity to remedy the discovery issues. Furthermore, Blair was clear that the grounds for the CrR 8.3 motion that Amos wanted filed was primarily based on missing discovery from the prosecuting attorney's office. He knew he would have a higher likelihood of prevailing on the motion to dismiss if he waited until the eve of trial to file his motion to dismiss. Blair did not think that there was much urgency in addressing the cell search because, in his experience, he could not take what Amos said at "face value." II VRP (Sept. 6, 2018) at 301. Although Blair understood that Amos believed privileged information had been taken, in Blair's experience Amos said "a lot of stuff, and it turns out not to be correct." II VRP (Sept. 6, 2018) at 313.

Blair testified that he spent hours discussing a plea agreement with Amos. Although Amos did not want to plead guilty he ultimately realized that "the discovery that we did have was not good for him." II VRP (Sept. 6, 2018) at 277. And a guilty plea would allow Amos to avoid a third strike offense or a potential 240 month sentence based on his high offender score. Specifically, Blair explained,

> And ultimately he decided—because I think during our discussion, I think we agreed that ultimately when he pled, he would have about seven more years to serve versus the other end of the spectrum that he could have going to trial, being convicted of a couple of deliveries, getting 240 [months] or more or life.

II VRP (Sept. 6, 2018) at 285. When discussing the plea agreement, Blair discussed the issues regarding the cell search with Amos. Blair testified "that was one of those issues that he knew he was waiving by taking this deal." II VRP (Sept. 6, 2018) at 280. Blair explained,

> So he's saying, "Hey, [Blair], I have these lists. They took my lists. They took this, they took that." Okay. So we get an order saying give us the material back that Judge Hunt has determined was privileged and the material that was not privileged.
> Before we can, I guess, execute that order, we get an offer. I talk to [Amos] about it, and he makes the determination—even though he knows we haven't gotten that material back, he makes the decision, "Okay, I'm going to take the deal." And like I said, I think the order was entered on—I think it was entered on July 30th, and then he pled [guilty] the very next day.

II VRP (Sept. 6, 2018) at 326. Furthermore, Blair was concerned that focusing on the seized documents would highlight something that Amos should not have been doing and the plea agreement alleviated those concerns. Ultimately, "a large part of the reason that [Amos] pled was the evidence that we did have was not good for [Amos]." II VRP (Sept. 6, 2018) at 314. When asked why he did not investigate the alleged intrusion into the attorney-client relationship before deciding to take the deal, Blair responded, "That wasn't my choice. That was [Amos'] choice." II VRP (Sept. 6, 2018) at 332.

B.    TRIAL COURT'S ORDER

Following the evidentiary hearing, the trial court entered written findings of fact addressing the six issues presented by this court's opinion.

1.    Nature of the Cell Search

The trial court found that the cell search was based on a search warrant issued by the district court. And the trial court found that Detective Haggerty did not involve the prosecuting attorney's

9

office prior to obtaining the search warrant or performing the search. During the search, Detective Haggerty only looked at the header of documents in an attempt to separate out documents related to Amos' DOC lawsuit.

The trial court specifically found that the search lasted approximately 10 minutes. And, if Detective Haggerty had read or reviewed all the documents the search would have taken significantly longer.

2. Whether Officers or Other State Officials Seized or Reviewed Documents

The trial court found that Detective Haggerty seized the documents authorized by his search warrant. After consulting with Blair and Eisenberg, Detective Haggerty sought *in camera* review of the seized documents.

The trial court found that Judge Hunt was "very careful" in performing the *in camera* review and erred on the side of caution when determining whether documents were privileged. CP at 243. The trial court also found,

> The documents received in Exhibit 41 ("Discovery packet 11") contains documents from the cell search, and were received by the Prosecuting Attorney's Office. Exhibit 41 contains no documents that could be construed as work product protected by the attorney-client privilege. These documents were received by the Prosecuting Attorney's Office on July 24, 2014.

Clerk's Papers (CP) at 244. The trial court further found that none of the seized documents "were received or reviewed by the Prosecuting Attorney's Office personnel until the hearing in this matter." CP at 244.

### 3. The Nature and Content of the Documents

The trial court's findings identify all the different types of documents that were seized from Amos' cell. The trial court also documented all the documents Amos claimed were privileged. However, the trial court recognized,

> Amos' testimony regarding his subjective opinion that certain documents constitute work product does not control the designation of such documents as work product protected by the attorney-client privilege.

CP at 246. The trial court found that Amos' handwritten notes were not work product protected by the attorney-client relationship because they were notes to himself, rather than notes to his attorney. However, the trial court did find that,

> The pages of discovery with notations in the margins constitute work product protected by the attorney client privilege because Mr. Blair told Amos to write notes on the police reports.

CP at 246.

### 4. If a Violation of the Attorney-Client Relationship did Occur, Whether the State Can Show Beyond a Reasonable Doubt that Amos Was Not Prejudiced

The trial court found,

> The only evidence seized in the cell search which may fall within the attorney-client privilege is the pages of discovery/police reports with Amos' notes in the margins. These notes were intended by Amos to be notes to himself that he could later develop into something his attorney could use—i.e., work product. The court finds beyond a reasonable doubt that Amos was not prejudiced by the seizure of these materials.

CP at 246. And the trial court found that Halstead did not review any of the seized documents before Amos pled guilty. The trial court also found that none of the seized documents had any impact on the plea negotiations.

5.      Whether Amos Would Not Have Pled Guilty but for His Attorney's Deficient Actions or Advice

The trial court found that Amos decided to plead guilty because the "evidence against him was not favorable." CP at 247. And the trial court found that Amos decided to accept the guilty plea despite discussions with Blair about the cell search. Specifically, the trial court found,

> Amos knew he was giving up the ability to bring a motion regarding the cell search when he decided to accept the plea offer.

CP at 247. And the trial court found that,

> Amos' testimony that he would not have pled guilty but for Mr. Blair's actions and advice is not credible.

CP at 247.

6.      Other Facts Necessary to Make a Determination

The trial court found that Blair was skeptical of Amos' statements to him about the search based on Blair's history with Amos. The trial court also found that Blair did not have reason to think that privileged materials were in Amos' cell. The trial court further found that Blair did not file a CrR 8.3 motion based on the cell search because he did not know if the attorney-client privilege had been invaded. And the trial court found,

> Mr. Blair had no reason to believe that privileged material was taken in the cell search because Amos has a history of over-stating matters to Mr. Blair; Mr. Blair knew that he had not sent anything to Amos; and knew what Amos had already provided to him, so he did not believe there could be any privileged materials in Amos' cell.

CP at 248.

In addition, the trial court found that Blair's delay in filing the CrR 8.3 motion "was a strategic decision." CP at 248. Blair felt the stronger argument would be raising the lack of

discovery close to trial. Although Blair started drafting the motion July 11, he waited to file it because he thought waiting would be strategically more advantageous.

7.      Conclusions and Order

Based on its findings, the trial court conclude that "[t]here was no violation of the attorney-client relationship." CP at 249. And the trial court concluded that "[a]ny possible violation of the attorney client privilege was harmless beyond a reasonable doubt." CP at 249.

The trial court also concluded that Amos' plea was knowing, intelligent, and voluntary. The trial court further concluded that Blair's performance was not deficient. Alternatively, the trial court found that, even if Blair's performance was deficient, the outcome of the proceedings would not have changed.

The trial court denied Amos' PRP. Amos appeals the trial court's order denying his PRP.

ANALYSIS

A.      LEGAL PRINCIPLES

Amos has sought relief from judgment in a PRP, alleging ineffective assistance of counsel resulted in him entering a plea that waived his right to collateral attack. Based on RAP 16.11 and RAP 16.12, this court remanded Amos' PRP to the trial court for a determination on the merits. *Amos*, 1 Wn. App. 2d at 601. It is unclear whether, following remand for a determination on the merits, we apply a direct appeal standard of review to the substantive issue or whether we apply the PRP standard of review. However, because review of ineffective assistance of counsel claims have the same standard of review regardless of whether they are raised on direct appeal or in a PRP, this distinction does not affect our review. *See State v. Grier*, 171 Wn.2d 17, 32-33, 246

P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014); *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

To be entitled to relief in a PRP, the petitioner must show either (1) a constitutional error resulting in actual and substantial prejudice, or (2) "a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *Crace*, 174 Wn.2d at 846-47.

An ineffective assistance of counsel claim is a mixed question of fact and law that we review de novo. *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's performance prejudiced the petitioner. *State v. Grier*, 171 Wn.2d at 32-33. If the petitioner fails to satisfy either prong, the defendant's ineffective assistance of counsel claim fails. *Id.* at 33.

We review the trial court's factual findings for substantial evidence. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 488, 276 P.3d 286, *cert. denied*, 568 U.S. 959 (2012). "'Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true.'" *Id.* (internal quotations marks omitted) (quoting *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999)). We will not disturb the trial court's findings that are supported by substantial evidence despite conflicting evidence. *Id*.

Furthermore, we recognize the law of the case doctrine applies here. "The law of the case doctrine provides that once there is an appellate court ruling, its holding must be followed in all of the subsequent stages of the same litigation." *State v. Schwab*, 163 Wn.2d 664, 672, 185 P.3d 1151 (2008). Therefore, based on the this court's earlier opinion, there are two questions raised in this appeal: (1) was counsel's performance deficient for failing to investigate and file a CrR 8.3 motion to dismiss based on the intrusion into the attorney-client relationship (deficient performance) and (2) would Amos not have pled guilty but for counsel's alleged deficient performance (prejudice). *Amos*, 1 Wn. App. 2d at 594-95, 600-01. Because Amos fails to meet his burden to prove prejudice, we do not address whether there was deficient performance. *See Grier*, 171 Wn.2d at 33.

B.      PREJUDICE

Even if Blair's performance was deficient as Amos alleges, Amos must also establish that he was prejudiced by Blair's deficient performance. Amos appears to misunderstand the prejudice standard applicable to his ineffective assistance of counsel claim. Amos argues that because the State failed to prove the violation of attorney-client privilege was harmless, the case should be dismissed. But as explained above, Amos is barred from collateral attack unless he establishes an ineffective assistance of counsel claim. He is not entitled to relief simply for establishing a violation of attorney-client privilege. Accordingly, we address whether Amos has met his burden to show that he was prejudiced by Blair's deficient performance.[6]

---

[6] Amos also argues that this court held in its prior opinion that if a CrR 8.3 motion would have resulted in dismissal, the correct remedy for Amos' PRP was dismissal. But this is incorrect. As explained, if Amos meets his burden of showing *ineffective assistance of counsel*—by proving that

Generally, when a petitioner has pled guilty, they must establish prejudice by showing that a defendant would not have pled guilty and would have insisted on going to trial. *Amos*, 1 Wn. App. 2d 595 n.7. However, we held that Amos need only establish a reasonable probability that, but for counsel's deficient performance, he would not have pled guilty. *Id.* at 595.

Here, the trial court concluded that "Amos' plea was knowingly, intelligently and voluntarily made, with a full understanding of the consequences of his plea, including the waiver of his right to litigate the legality of the cell search and the possible violation of the attorney-client privilege." CP at 249. Furthermore, the trial court concluded that the outcome of the proceedings would not have been different. These conclusions are based on the trial court's findings that Amos decided to plead guilty because of the unfavorable evidence against him and because Amos knew he was giving up the ability to bring a motion regarding the cell search when he decided to accept the plea offer.

Amos assigns error to these findings. However, Amos provides no meaningful argument regarding why substantial evidence does not support these findings. RAP 10.3(a)(6); *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012), *review denied*, 176 Wn.2d 1014 (2013). Therefore, we consider these findings verities on appeal. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

Even if we considered Amos' assignment of error to these findings, the findings are supported by substantial evidence. Specifically, Blair testified that Amos pled guilty because he

---

he would not have pled guilty but for Blair's deficient performance—then the remedy is dismissal. *Amos*, 1 Wn. App. 2d at 597-98, 600-01. Because Amos fails to meet his burden for relief the proper remedy is denial of Amos' PRP.

came to understand the evidence against him was not favorable. And Blair testified that he discussed with Amos prior to Amos accepting the plea agreement the fact that Amos would be abandoning his arguments regarding the cell search by pleading guilty. The only evidence disputing Blair's testimony is Amos' testimony, which the trial court specifically found was not credible. We do not review the trial court's credibility determinations. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

Based on the trial court's findings and conclusions, Amos has not met his burden to show that but for Blair's deficient performance, he would not have pled guilty. Amos knew he was giving up the opportunity to obtain possible dismissal, or even preserve the cell search for appeal, by pleading guilty. "That was [Amos'] choice." II VRP (Sept 6, 2018) at 332. After spending hours discussing the plea with counsel, Amos realized that "the discovery that we did have was not good for him," and a guilty plea would allow Amos to avoid a third strike offense or a potential 240 month sentence based on his high offender score. II VRP (Sept. 6, 2018) at 277. Therefore, Amos failed to meet his burden to show that but for Blair's deficient performance he would not have pled guilty. Because Amos has not met his burden to show prejudice, his ineffective assistance of counsel claim fails.

                                        SAG

In his SAG, Amos raises additional arguments regarding why the State intruded on the attorney-client relationship and why the State failed to meet its burden to prove beyond a reasonable doubt that there was no prejudice. He also makes other arguments why the State's actions were improper. Because Amos failed to prove there was no prejudice, we do not separately address Amos' SAG arguments.

No. 52872-0-II

Amos also claims that our prior opinion holds that he does not have to show a reasonable probability that but for Blair's deficient performance he would not have pled guilty. However, Amos misreads our opinion. As explained here, we held that Amos was not required to show he would have insisted on going to trial. *Amos*, 1 Wn. App. 2d at 595 n.7. However, he is required to prove that he would not have pled guilty in order to establish prejudice. *Id*. at 595.

Because Amos has failed to meet his burden to show prejudice, his ineffective assistance of counsel claim fails. Following remand, the trial court properly denied Amos' PRP. Accordingly, we affirm the trial court's order on remand denying Amos' PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, C.J.

We concur:

Maxa, J.

Glasgow, J.

18